IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| NIHAL MENEKSE, | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| HARRAH'S CHESTER CASINO & | : | NO. 12-4912 |
| RACETRACK. | : | |

**Restrepo, J.**                                                                     **June 16, 2014**

## MEMORANDUM

Nihal Menekse was a beverage server employed with Harrah's Chester Casino & Racetrack (Harrah's) from January 2007 until July 2011, when she was terminated for allegedly threatening a coworker. On August 27, 2012, she brought suit against Harrah's for religious and national origin discrimination under Title VII and the Pennsylvania Human Relations Act (PHRA), and for retaliation under Title VII, the PHRA and the Family Medical Leave Act (FMLA). Now pending is Harrah's motion for summary judgment on Menekse's remaining claims: retaliation under Title VII, the PHRA and the FMLA. For the reasons explained below, the motion will be granted.

**I.   FACTS**[1]

      **A.  Comments Made Regarding Menekse's Religion or National Origin**[2]

Menekse is of Turkish descent and is a practicing Muslim. She alleges that during her time at Harrah's she was the object of degrading comments based on those protected classes. She first alleges that John Truitt, her former supervisor at Harrah's, treated her unfairly because of

---

[1] All reasonable factual inferences are drawn in favor of Menekse. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

[2] While Menekse withdrew her claims for religious and national origin discrimination at argument, ECF No. 44, Tr. 50:13-20, the facts surrounding these comments are relevant for the analysis of her remaining claims.

her religion or national origin. Menekse alleges that she found this out when a coworker, Lori Robinson, told her that Truitt stated that he didn't like Menekse "because of 9/11, the tragedy." Joint Appendix ("JA") at 20.[3] Truitt himself never made any comments to Menekse about her race or national origin, but did use generally crude language when speaking with her. JA at 23. Menekse contends that Truitt often made it difficult for her at work, whether by inappropriately failing to approve FMLA leave, or by giving preferential treatment to employees who had less seniority than she did. JA at 45-50, 151-53. She believes this was because of her religion and national origin.

Two other employees allegedly made religious or national origin based comments that Menekse herself heard. First, Menekse contends that in March of 2011, a Harrah's dealer from a different unit than Menekse saw her nametag and asked her if she were Muslim. JA at 61-64. After she replied yes, that dealer reportedly asked whether she was carrying a bomb and whether she was a terrorist. JA at 61-62. The dealer's own supervisor is alleged to have overheard these comments, immediately reprimanded the dealer, and stated that he would report him to the Harrah's human resources department if Menekse did not do so. JA at 64. Menekse did not report the incident, and returned to work. *Id.* The manager, however, did report it, and while on her shift Menekse was told to go to HR to discuss it. *Id.*

While at HR Menekse was very briefly questioned about the incident by Deotis Carolina, a Harrah's supervisor. JA at 65. Carolina allegedly told Menekse to "hold on a second," and left the room. *Id.* After waiting for Carolina to return for approximately ten or fifteen minutes, Menekse tired of waiting, decided to leave, and went back to work. JA at 67. Menekse is

---

[3] The only evidence that purportedly shows that Truitt did not like her because of her national origin or religion is this conversation. Truitt and Robinson were apparently not deposed in this matter, and Menekse's recall of her conversation with Robinson, where Robinson relayed a statement from Truitt, is inadmissible double hearsay.

unaware of the result of any investigation of the incident or whether the dealer was disciplined beyond a verbal reprimand. *Id.* She never spoke with anyone from Harrah's management about it again. JA at 67-68.[4]

Finally, Menekse contends that in April of 2011, a different dealer read her nametag and, ostensibly because of her unique name, asked where she was from. JA at 74. When Menekse responded that she was from Turkey, he allegedly responded "Oh, so you're a gobble gobble? Are you going to be cooked on Thanksgiving?" *Id.* Menekse did not report the incident to Harrah's management. JA at 78.[5]

### B. Menekse's Use of FMLA Time

Menekse was intermittently on FMLA leave much of her time with Harrah's, either to care for her child or for her own medical condition. JA at 156-57. Menekse alleges that Truitt often made it difficult for her to take this leave and harassed her when she did so. JA at 152-54. Truitt's last time allegedly harassing her for this was in late 2010 or early 2011. *Id.* In total, she was excused from work approximately twenty-two times pursuant to the FMLA. JA at 316.

On March 21, 2011, Menekse applied for additional FMLA time to care for her son and his new medical condition. JA at 318. Harrah's contends it sent Menekse an FMLA form to fill out and that she never did so, and thus, the FMLA request was denied. JA at 324-26. Menekse does not recall ever receiving the form. Pl.'s Aff., ECF No. 42-1, ¶ 9. Regardless, as a result of not being approved for FMLA, Menekse was assessed points for missing days without approval six times between April 22, 2011 and June 30, 2011. JA at 316.

---

[4] As with Truitt, the dealer, the supervisor who reprimanded him and Carolina were not deposed in this matter.

[5] This dealer was not deposed in this matter.

### C. Menekse's Disciplinary History and Termination

Harrah's has a four-step, progressive discipline policy. JA at 224. The first step in the policy is a documented coaching, followed by a written warning, a final written warning, and finally, termination. *Id.* During her employment, Menekse received notice of at least fifteen disciplinary infractions, documented by at least five different supervisors. JA at 230-274. Those incidents ranged from the minor – using her cell phone on duty in 2009, JA at 181 – to the serious, including allegedly over-serving alcohol to a Harrah's patron. JA at 187. The March, 2011 allegation of over-serving a patron led to Menekse being given a final written warning, such that another disciplinary incident would lead to her termination. JA at 187-89, 224.

The final disciplinary incident occurred on July 5, 2011, and stemmed from the practice of "poaching," where one beverage server would improperly venture into a coworker's territory and take beverage orders from that coworker's customers. On June 1, 2011, Menekse allegedly "poached" from a coworker. JA at 258-59. She had to write an explanation for her actions, but she was not disciplined. *Id.* On June 18, 2011, another Harrah's beverage server, Dorothy Tighe, poached from Menekse. JA at 262-64. Tighe was disciplined for that conduct, in the form of a documented coaching in her employee file. JA at 262.

On July 5, 2011, in a pre-shift meeting, with Tighe's poaching on her mind, Menekse asked to speak with Susan Crowley, the Harrah's supervisor running the meeting. Crowley alleges that Menekse began pointing at Tighe and said "She better stay out of my section or I will fuck her up, I mean it!" JA at 273. Crowley asked Tighe and a second employee, Arlene Anderson, to prepare written statements documenting what they witnessed. Both of them did so, confirming the same general statement made by Menekse. JA at 270-72. Tighe added that she did not feel safe at work; she worried that Menekse was going to physically harm her. JA at 270.

Menekse herself doesn't dispute that there was a heated discussion. She contends, however, that during the meeting she only said "stay the fuck out of my section" to Tighe, rather than the more explicit threat of violence that the other employees report.[6] JA at 147. Crowley sent Menekse home immediately following the incident. JA at 335. On July 6, 2011, Menekse was terminated. JA at 267.

## II.     LEGAL STANDARD

Summary judgment will be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). A genuine issue exists if the evidence is such that a reasonable jury could return a verdict for the non-moving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A factual dispute is "material" if it might affect the outcome of the case under governing law. *Id*. at 248.

When deciding a motion for summary judgment, a court must draw all reasonable inferences in the light most favorable to the non-moving party. *Id*. at 255; *Hugh v. Butler Cnty. Family YMCA*, 418 F.3d 265, 267 (3d Cir. 2005) (citations omitted). Thus, summary judgment is appropriate if, after reviewing the evidence and making all inferences in favor of the non-moving party, there is no genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

---

[6] Menekse alleges that another Harrah's employee, Kathy McLaughlin, witnessed the incident and corroborates her version of events. However, the record demonstrates that McLaughlin was not actually at Harrah's at the time the incident occurred. JA at 327-28. Moreover, McLaughlin, Menekse's former shop steward, was not deposed in this matter and did not submit a sworn declaration. In fact, the only support for the claim that McLaughlin witnessed anything is an unsworn letter that she apparently submitted to the EEOC in its investigation. JA at 299-304.

### III. DISCUSSION

#### A. Title VII Retaliation

Title VII protects employees who oppose conduct prohibited by that law. To proceed on her claim, Menekse may utilize the burden-shifting framework first explained in *McDonnell Douglas Corporation v. Green*, 411 U.S. 792 (1973). Accordingly, she must demonstrate "(1) that [she] engaged in a protected employee activity; (2) that [she] was subject to adverse action by the employer either subsequent to or contemporaneous with the protected activity; and (3) that there is a causal connection between the protected activity and the adverse action." *Fasold v. Justice*, 409 F.3d 178, 188 (3d Cir. 2005) (internal citations omitted). If Menekse does so, "the burden shifts to the defendant 'to articulate some legitimate, nondiscriminatory reason' for the adverse employment action." *Barker v. Boeing Co.*, No. 12-6684, 2014 WL 1976894, at *4 (E.D. Pa. May 14, 2014) (quoting *McDonnell Douglas,* 411 U.S. at 802.). "Once the employer does this, the burden 'rebounds to the plaintiff, who must now show by a preponderance of the evidence that the employer's explanation is pretextual.'" *Id.* (quoting *Anderson v. Wachovia Mortg. Corp.*, 621 F.3d 261, 271 (3d Cir. 2010)). As explained below, Menekse does not establish a viable prima facie claim.

Menekse's allegation that she engaged in protected activity has significant weaknesses. Not every complaint to an employer is protected. As the Third Circuit has noted, "[o]nly complaints about discrimination prohibited by Title VII – that is, discrimination on the basis of race, color, religion, sex, or national origin . . . constitute protected activity." *Davis v. City of Newark*, 417 F. App'x 201, 203 (3d Cir. 2011) (citing *Barber v. CSX Distrib. Servs.*, 68 F.3d 694, 701-02 (3d Cir. 1995)). At her deposition, Menekse testified about numerous general complaints to Harrah's. However, when asked at argument to identify what complaints in the

record established that she engaged in protected activity, her counsel identified just one: the March, 2011 incident, where a dealer allegedly referred to her as a terrorist. While opposing discrimination of this kind would surely be protected by Title VII, the record indicates that a supervisor at Harrah's, not Menekse, reported the discriminatory conduct. Furthermore, Menekse testified that after tiring of waiting for her supervisor to return to the HR meeting that she left, and didn't speak with anyone from management about it again. Thus, it is unclear that Menekse's activity could even be considered opposing discrimination.

Additionally, even assuming *arguendo* that Menekse's brief visit to HR is interpreted as protected activity, her claim falters for failure to plausibly allege a causal link between that activity and her subsequent termination. One allegation commonly offered to demonstrate causation is a close temporal proximity between the protected activity and the adverse action. *See*, *e.g.*, *Jalil v. Avdel Corp.*, 873 F.2d 701, 708 (3d Cir. 1989) (finding that temporal proximity raised an inference of retaliation when adverse action occurred only two days after the protected activity). "While the passage of mere hours or days has been deemed unusually suggestive, courts have held that the passage of weeks, months, and years removes any suggestion of retaliatory motive." *Shenk v. Pennsylvania*, No. 11-1238, 2013 WL 1969311, at *8 (M.D. Pa. May 13, 2013). Menekse undertook the alleged protected activity three to four months prior to her termination. Such a gap is too long to qualify as suggestive of causation. *See Williams v. Philadelphia Hous. Auth. Police Dep't*, 380 F.3d 751, 759-60 (3d Cir. 2004) (finding two-month gap insufficient).

The absence of temporal proximity alone, however, is not fatal to Menekse's claim. The Third Circuit has instructed that when "the time between the protected activity and adverse action is not so close as to be unusually suggestive . . . courts may look to the intervening period

for demonstrative proof, such as actual antagonistic conduct or animus against the employee." *Marra v. Phila. Hous. Auth.*, 497 F.3d 286, 302 (3d Cir. 2007). Moreover, temporal proximity and antagonistic conduct "are not the exclusive ways to show causation, as the proffered evidence, looked at as a whole, may suffice to raise the inference." *Kachmar v. SunGard Data Sys., Inc.*, 109 F.3d 173, 177 (3d Cir. 1997) (citation omitted). "Indeed, the Court of Appeals for the Third Circuit has set forth 'no limits' on the kinds of evidence that a court may consider when searching the record for the required causal link." *Nesmith v. Independence Blue Cross*, No. 02-2894, 2004 WL 253524, at *3 (E.D. Pa. Feb. 10, 2004) (quoting *Farrell v. Planters Lifesavers Co.,* 206 F.3d 271, 281 (3d Cir. 2000); *see also Wade v. Donahoe*, No. 11-3795, 2012 WL 3844380, at *7 (E.D. Pa. Sept. 4, 2012) (analyzing complaint for allegations of intervening antagonism notwithstanding passage of seven years since protected activity); *Lee v. City of Philadelphia*, No. 13-510, 2014 WL 736185, at *4 (E.D. Pa. Feb. 26, 2014) (finding that in nine-year intervening period, repeated, unexplained denials of promotions created plausible causal link). In sum, "[t]he element of causation is highly context specific, and requires looking at the record as a whole to determine whether the plaintiff has raised an 'inference that her protected activity was likely the reason for the adverse action.'" *Nesmith*, 2004 WL 253524 at *3 (quoting *Kachmar,* 109 F.3d at 177-78). Considering the record as a whole, there is scant evidence to support a causal link between the incident with the dealer and Menekse's termination. Her own deposition testimony provides little evidence by which a reasonable jury could find the required causal link, and she did not depose any decisionmakers or witnesses or provide documents that adequately support her claim. Accordingly, Menekse has not met her prima facie burden and her discrimination claim fails.[7]

---

[7] Moreover, even assuming she had met her burden, she could not survive a pretext analysis, as explained in section C, below.

### B. FMLA Prima Facie Analysis

FMLA retaliation claims are analyzed through the same burden-shifting framework as Title VII claims.[8] *See Lichtenstein v. Univ. of Pittsburgh Med. Ctr.*, 691 F.3d 294, 302 (3d Cir. 2012). Thus, Menekse "must point to evidence in the record sufficient to create a genuine factual dispute about each of the three elements of her retaliation claim: (a) invocation of an FMLA right, (b) termination, and (c) causation." *Id.* (internal citations omitted). There is no material dispute that Menekse stated that she needed to take FMLA leave. Such a request qualifies as an invocation of an FMLA right. *See id.*; *Sarnowski v. Air Brooke Limo., Inc.*, 510 F.3d 398, 402 (3d Cir. 2007) (applying liberal standard to what constitutes employee notice to employer of invocation of FMLA right). Thus, because Menekse was terminated, whether she makes out the elements of a prima facie case turns on whether she can demonstrate causation.

As in Title VII retaliation cases, temporal proximity can be one indicator of causation. *See Lichtenstein*, 691 F.3d at 307. Menekse's requests for FMLA leave were denied on six different days beginning on April 22, 2011 and ending on June 30, 2011. She was terminated on July 6, 2011. "While there are no bright lines, '[w]here the temporal proximity between the protected activity and the adverse action is unusually suggestive, it is sufficient standing alone to create an inference of causality and defeat summary judgment.'" *Butler v. BTC Foods, Inc.*, No. 12-0492, 2014 WL 336649, at *8 (E.D. Pa. Jan. 30, 2014) (quoting *LeBoon v. Lancaster Jewish Cmty. Ctr. Ass'n*, 503 F.3d 217, 232 (3d Cir. 2007)) (holding gap of one week sufficiently small to create inference of causation); *see also Abdul-Latif v. Cnty. of Lancaster*, No. 12-948, 2014

---

[8] At argument Counsel for Menekse obliquely referred to an FMLA-interference claim. A review of her complaint demonstrates that she did not bring such a claim. Moreover, the only reference to an interference claim in her summary judgment response is a sentence that states that "the repeated refusal to allow her to use her approved FMLA leave might well support an interference claim in addition to her retaliation claim." ECF No. 39 at 12. Whatever such evidence might do, Menekse never raised it and presents no law to support it.

9

WL 47773, at *8 (E.D. Pa. Jan. 7, 2014) (finding six days sufficient to create inference of causation). Here, the one-week gap between Menekse's request and her termination is sufficiently small that it creates a triable issue as to whether her request for FMLA was the cause of her termination. Thus, Menekse has met her prima facie burden.

### C. Pretext

Because Menekse has met her prima facie burden under the FMLA, "the burden shifts to the defendant 'to articulate some legitimate, nondiscriminatory reason' for the adverse employment action.'" *Barker*, 2014 WL 1976894 at *4 (quoting *McDonnell Douglas,* 411 U.S. at 802). There is little doubt that Menekse's history of disciplinary problems, which culminated in an incident where three different employees provided written statements confirming that she cursed at and threatened a coworker, provides a legitimate reason to terminate her. "It therefore falls to [Menekse] to demonstrate that this explanation for [her] firing was pretext, through evidence that 'a discriminatory reason more likely motivated [Harrah's] or . . . that [Harrah's] proffered explanation is unworthy of credence.'" *Id.* (quoting *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 256 (1981)).

This Menekse cannot do. The record indicates that Harrah's has a progressive discipline policy, that Menekse was disciplined many times pursuant to that policy, that she was put on a "final written warning" in March of 2011, and that on July 5, 2011, she had her verbal altercation with Tighe, which was witnessed by two other employees. In response, Menekse does not deny much of what occurred. She simply contends that while she cursed at Tighe, she didn't *also* threaten her. In effect, she "[m]erely argue[s] that her dispute[] with her co-worker[] [was] minor," such that she shouldn't have been fired. *Capilli v. Whitesell Const. Co*., 271 F. App'x 261, 266 (3d Cir. 2008). Such a claim is insufficient because, the Third Circuit has explained, a

Court may not attempt to decipher whether an employer's decision was "wise, shrewd, prudent, or competent," *Kautz v. Met-Pro Corp.*, 412 F.3d 463, 467 (3d Cir. 2005) (citing *Fuentes v. Perskie*, 32 F.3d 759, 764 (3d Cir. 1994)), but instead, must examine whether a proffered reason has "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions . . . that a reasonable factfinder could rationally find [it] unworthy of credence." *Id.* (citing *Fuentes*, 32 F.3d 759 at 765). The record here is replete with disciplinary actions against Menekse. It also contains three written statements collected by Harrah's confirming the incident that led to her termination. Menekse, on the other hand, provides no evidence by which a reasonable jury could determine this to be pretextual. Accordingly, Menekse's claim fails as a matter of law, and the motion must be granted.

## IV. CONCLUSION

For the reasons stated above, Harrah's motion for summary judgment will be granted on each claim. An appropriate Order will follow.